# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT
### EN BANC

| | | |
|---|---|---|
| **DAVID ZINK, et. al.,** | ) | |
| | ) | |
| **MICHAEL WORTHINGTON,** | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | No. 14-2220 |
| | ) | |
| v. | ) | **THIS IS A CAPITAL CASE** |
| | ) | |
| **GEORGE LOMBARDI, et al.,** | ) | **Execution scheduled for** |
| | ) | **12:01 a.m., August 6, 2014** |
| Defendants-Appellees. | ) | |

## APPELLANT MICHAEL WORTHINGTON'S MOTION FOR STAY OF EXECUTION

For the following reasons, Appellant Michael Worthington, pursuant to 28 U.S.C. §1651, respectfully requests that this Court issue a stay of execution.

## I.

## INTRODUCTION

Missouri intends to execute Michael Worthington at 12:01 a.m. on August 6, 2014 with an unregulated compounded drug, from an undisclosed supplier, from unknown ingredients, and through unknown processes. The district court ruled that Mr. Worthington and his fellow plaintiffs described sufficient evidence of harm for their Eighth Amendment claim. (Add. 8).[1]  The unrefuted expert reports attached to the

---

[1]The appellants electronically filed their opening brief, addendum, and appendix in this appeal on July 28, 2014.  This motion borrows heavily from this brief and focuses solely upon appellant's Eighth Amendment claim.  Although the other

complaint describe a "substantial risk of serious, unnecessary and substantial harm and mental anguish," and a "substantial risk of ... severe and unacceptable levels of pain and suffering." (App. 236, 259-266, 270).

The district court below dismissed the Eighth Amendment claim solely because Mr. Worthington and his fellow prisoners did not specifically plead a "readily available" alternative way for the state to kill them, and could not do so without the aid of discovery into the state's pursuit of "available" drugs and suppliers. (Add. 8-10, 25-26). This decision is erroneous because it conflicts with this Court's ruling on rehearing in *In re Lombardi*, 741 F.3d 903, 905 (8th Cir. 2014) (en banc), ("*Lombardi II*"), which acknowledged the Supreme Court's holding that there is "no specific pleading requirement that a prisoner must identify an alternative, authorized method of execution to proceed in a § 1983 action." *Id.*, quoting *Hill v. McDonough*, 547 U.S. 573, 582 (2006). The district court's ruling also conflicts with the plain language of the Supreme Court's opinions in *Hill* as well as *Jones v. Bock*, 549 U.S. 199, 213 (2007). This decision is also unreasonable in light of the district court's ruling, within the same order, terminating all discovery and thereby disabling the prisoners from discovering what pharmaceuticals and devices are "reasonably available" to the Missouri Department of Corrections.

---

points raised in the brief are substantial, the appeal of the district court's reason for dismissing the Eighth Amendment claim is a "dead bang winner." *See Page v. United States*, 884 F.2d 300, 302-303 (7th Cir. 1989).

2

(Add. 9-10, 24). Finally, the district court's ruling places the prisoners' attorneys into an impossible ethical dilemma by forcing them to advocate for a client's death. Mo. Sup. Ct. R. 4-1.2(a), 4-1.3, 4-1.7.

More importantly, these flaws in the district court's decision justify a stay of execution pending appeal when considered in conjunction with the Supreme Court's issuance of a stay of execution in *Bucklew v. Lombardi*, 134 S.Ct. 2333 (2014). The Court in *Bucklew* entered a stay despite the state's lengthy insistence that it may execute Mr. Bucklew because he, too, failed to propose a "specific, feasible, more humane method of execution." (App. 807-810). If that view were the definitive law, Russell Bucklew would now be dead. Mr. Worthington is entitled to a stay of execution pending final disposition of this meritorious appeal.

## II.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    Missouri's execution method

The above-captioned appeal concerns the method of execution announced by the Missouri Department of Corrections ("DOC") in October 2013 and serially modified since that time. (*See* App. 228-229, 560-562) (no disclosure of test results or existence of testing); *Bucklew v. Lombardi*, Eighth Circuit Case No. 14-2163, Order of May 20, 2014 at 8-9 (change from methylene blue to indigo carmine to the use of no dye to verify functioning of IV lines). The state executes prisoners with a single dose of what it alleges

3

to be pentobarbital, made by an undisclosed and non-FDA-regulated compounding pharmacy that the DOC has named to its "execution team," and composed of unknown ingredients whose sources the DOC also hides. Beginning with the execution of Michael Taylor in February 2014, the DOC has provided no testing data to show that the substance is in fact pentobarbital, or that it is pure, potent, and sterile

## B.  The prisoners' evidence of harm

The relevant expert evidence on the use of compounded pentobarbital is undisputed and was attached to the prisoners' second amended complaint.  (App. 233, 282, 290-291, 519-522).  Unregulated by the FDA and of unknown origin, compounded pentobarbital presents numerous hazards that create a "substantial risk of serious, unnecessary and substantial harm and mental anguish," according to pharmacology expert Dr. Larry D. Sasich.  (*Id.* 270).  These hazards include sub-potency or super-potency; contamination from toxins, allergens, or particles; and burning or a pulmonary embolism resulting from failure to reach and maintain the proper pH. (*Id.* 259-266).  Anesthesiologist Dr. Mark Heath agrees, concluding that Missouri's protocol is "replete with flaws that present a substantial risk of causing severe and unacceptable levels of pain and suffering during the execution."  (*Id.* 236).

During the course of this litigation, the DOC's protocol has materially worsened. Earlier in the litigation, the DOC assured the district court that it tests its drugs to be sure they are safe, pure, and effective, so that the prisoners did not need to know the

4

source of the drugs despite the unrefuted medical evidence—which was made part of the prisoners' complaint—that it was essential to know where the drug comes from, how it is made, and what it is made of. (*Id.* 234, 260-261).

The DOC made those same assurances to this Court when it sought mandamus relief from the district court's discovery orders:

> Because the chemical tests within the proper ranges, it does not matter who made it. Additionally, the Director will not use a chemical that fails a lab test.

*In re Lombardi*, Eighth Cir. Case No. 13-3699, Petition for Writ of Mandamus (Dec. 13, 2013), at 16; *see also* Motion for stay of district court orders (Dec. 27, 2013), at 5 ("The name or the identifying information of whether the pharmacist is part of a national chain, a local pharmacy, or something in between, does not matter when the Court knows the end-product was potent, pure, sterile and worked effectively.").

In recent months, the DOC has refused to disclose any test results, and has successfully resisted all discovery of whether it even tests the drugs **at all**. (*See* Depo of Matthew Briesacher (Mar. 21, 2014), at 43-44, 72-73; App. 560-561 (motion for protective order); App. 642-643, 651; Add. 24). We are left, then, with the DOC's say-so that the drugs are what it says they are, coupled with its argument that the prisoners are speculating without benefit of the very information that the Department refuses to provide. ECF Doc. 196 at 1 (district court noting "Catch-22" situation in denying Allen Nicklasson a stay of execution).

Appellate Case: 14-2220    Page: 5    Date Filed: 07/30/2014 Entry ID: 4180985

## C.    Relevant procedural history

Some two months after the DOC announced its new protocol and dubiously named its supplier a secret member of the "execution team,"[2] the district court ordered a limited disclosure of the DOC's pharmacy, testing laboratory, and prescribing physician.  (ECF Docs. 203-05; App. 33).  This Court eventually vacated that order, reasoning that an Eighth Amendment claim could not go forward under *Baze v. Rees*, 553 U.S. 35 (2008), without the plaintiffs proposing an alternative method of execution, that the prisoners' ex post facto claim failed as a matter of law, and that the pharmacy's and laboratory's identities were not relevant to the remainder of the prisoner's then-pending claims. *See In re Lombardi*, 741 F.3d 888, 895-97 (8th Cir. 2014) (en banc) ("*Lombardi I*").

This Court clarified its ruling on rehearing.  The court distinguished *Hill v. McDonough*, 547 U.S. 573 (2006), and the Supreme Court's holding that there is "no specific pleading requirement that a prisoner must identify an alternative, authorized method of execution to proceed in a § 1983 action." *In re Lombardi*, 741 F.3d 903, 905 (8th Cir. 2014) (en banc) ("*Lombardi II*"), quoting *Hill*, 547 U.S. at 582. *Hill* differed from the present case, the Court concluded, because the prisoner in *Hill* conceded that "other methods of lethal injection the Department could choose to use would be

---

[2]

*See* Mo. Rev. Stat. § 546.720.2, defining "execution team" as "those persons who administer lethal gas or lethal chemicals and those persons, such as medical personnel, who provide direct support for the administration of lethal gas or lethal chemicals."

6

constitutional," and alleged and "that the challenged procedure presents a risk of pain the State can avoid while still being able to enforce the sentence ordering a lethal injection." *Id.* The Court pointed out that the *Zink* prisoners included no such allegations in their complaint. *Id.*

Mr. Worthington and his fellow plaintiffs thereafter amended their complaint to include this language from *Hill.* (App. 117, 202). They also asserted nine additional claims, several of which are at issue in this appeal. (*Id.* 117-200; 202-221). The district court dismissed these claims in two separate orders. (Add. 1-26). On the Eighth Amendment claim, the court ruled that the prisoners showed a sufficient enough risk of harm to proceed. (Add. 8). Nevertheless, the court reasoned that the prisoners lacked a viable Eighth Amendment claim without having pleaded a specific alternative method that is "reasonably available" and "less likely to create a substantial risk of harm." (*Id.* at 9-10). The court deferred its ruling on the claim in order to allow the prisoners to plead a specific alternative, which they declined to do. (*Id.* 10; App. 736-738).

Plaintiffs explained that *Baze* does not require a prisoner to specifically plead an alternative method, that the complaint's language from *Hill* made their claim sufficient under *Lombardi II*, that they could not specify a "feasible" and "readily implemented" alternative under *Baze* without discovery of the DOC's attempts to obtain other lethal injection drugs, and that it is unethical for plaintiffs' counsel to recommend that the state kill their clients in any particular way. (*Id.* 736-738). The district court then dismissed

7

the Eighth Amendment claim and issued its final order and judgment on May 16, 2014. (Add. 25-26; App. 744).

Mr. Worthington and the other prisoners filed a timely notice of appeal. On June 30, 2014, the Missouri Supreme Court scheduled Mr. Worthington's execution for August 6, 2014. On July 3, 2014, this Court, *sua sponte*, ordered that this appeal be heard initially *en banc*. The Court also issued an expedited briefing schedule and set this appeal for oral argument on September 9, 2014.

## III.

## ARGUMENT

### A. Standards Governing a Stay of Execution

The standard for granting a stay of execution is well-settled. Relevant considerations for granting a stay include the prisoner's likelihood of success on the merits, the relative harm to the parties, and the extent to which the prisoner has unnecessarily delayed his or her claims. *Hill v. McDonough*, 547 U.S. 573, 584 (2006); *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004). The "traditional" standard for a stay also requires a reviewing court to determine "where the public interests lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). In light of the expedited schedule in this appeal, the stay of execution requested by Mr. Worthington will be limited to a few months. All of the equities in this case weigh in favor of staying Mr. Worthington's execution pending this expedited and meritorious appeal of the district court's ruling.

8

## B. Mr. Worthington brings a meritorious Eighth Amendment claim and is likely to succeed in this appeal.

Mr. Worthington must show a "significant possibility of success on the merits" to obtain a stay. *Hill v. McDonough*, 547 U.S. 573, 584 (2006). That standard, of course, governs stay determinations in the Supreme Court as well this Court. In granting a stay of execution to Russell Bucklew, therefore, the Supreme Court necessarily ruled that he showed a "significant possibility of success on the merits." *Bucklew*, 134 S.Ct. 2333 (2014). Mr. Worthington shows a "significant possibility" of success because the questions he presents are substantially the same as those underlying the *Bucklew* litigation.

This Court must presume that the Supreme Court was following the law when it stayed Mr. Bucklew's execution. Prominently featured before the Supreme Court was the issue of whether Mr. Bucklew must propose an alternative method of execution in order to bring a viable Eighth Amendment claim. The district court answered that question affirmatively, and the state argued the point at length when opposing a stay. (App. 807-810). The state defended the district court's ruling that Mr. Bucklew's complaint "did not allege or even acknowledge a feasible and more humane alternative method of execution," and therefore, that Mr. Bucklew "failed to allege sufficiently an Eighth Amendment claim under *Baze*." (*Id.* at 807). The state went on to criticize various modifications recommended by Mr. Bucklew, such as the proposal that the Department allow a non-execution team physician to be present in order to revive Mr. Bucklew

9

during a botched execution, because the proposals "are not really changes in the method of execution." (*Id.* at 808-810).

Mr. Bucklew's attorneys argued *Baze* does not require the prisoner to propose an alternative means of his demise, particularly in light of the Court's earlier rulings in *Hill v. McDonough*, 547 U.S. 573, 582 (2006), and *Jones v. Bock*, 549 U.S. 199, 213 (2007), both of which disclaimed such a pleading requirement. (App. 776-779, 821). Bucklew argued that he could not allege an alternative method without the ability to discover undisclosed facts "regarding the drugs to be used, their origin, and the ingredients used in compounding them." (*Id.* 765, 794, 821-822). Finally, Bucklew argued that the alternative-method requirement creates a conflict of interest between the prisoner and counsel, who, in order to fulfill this requirement, must advocate for the client's death and lend their assistance to bring it about in a particular manner. (*Id.* 781-783, 794).

Mr. Worthington advances the same arguments now as those described above, and indeed, the alternative-method issue is the only reason why the district court rejected his claim. (Add. 7-10). It bears repeating that a stay applicant must show a "significant possibility of success on the merits." *Hill*, 547 U.S. at 584. If a prisoner were required to plead an alternative method in order to survive a motion to dismiss, then Mr. Bucklew could not have shown a "significant possibility of success on the merits" without specifying such an alternative himself.

10

The *Bucklew* ruling casts grave doubt on this Court's precedent. *In re Lombardi*, 741 F.3d 888, 896 (8th Cir. 2014) (en banc) (*Lombardi I*), states that an Eighth Amendment claim requires either a "a plausible allegation of a feasible and more humane alternative method of execution" or a "purposeful design by the State to inflict unnecessary pain." Russell Bucklew would have been executed on May 21 if this statement accurately described the law. The Supreme Court in *Bucklew* declined to follow the rule of *Lombardi I*, and that development alone requires a stay. This Court's precedent is not binding when "an intervening expression of the Supreme Court is inconsistent with those previous opinions." *Young v. Hayes*, 218 F.3d 850, 853 (8th Cir. 2000).

### C. Supreme Court precedent expressly rejected any requirement that a prisoner propose an alternative execution method.

In *Jones v. Bock*, 549 U.S. 199, 213 (2007), the Supreme Court stated:

In *Hill v. McDonough*, 547 U.S. 573 (2006), we unanimously rejected a proposal that §1983 suits challenging a method of execution must identify an acceptable alternative.

Issued less than one year later, the opinion in *Baze v. Rees*, 553 U.S. 35 (2008), does not remotely suggest that the Court was departing from *Jones* and *Hill*, or that the Court was creating a new pleading or proof requirement of an alternative execution method. The Court instead disapproved any test that compares one method to another, which would "transform courts into boards of inquiry charged with determining 'best practices' for executions, with each ruling supplanted by another round of litigation touting a new

11

and improved methodology." *Baze*, 553 U.S. at 51. Indeed, *Baze* did not attempt to distinguish or even mention *Jones* or *Hill*.

The Court in *Baze* was confronted with the specific claim that Kentucky's execution protocol violated the Eighth Amendment because the state could easily change to a one-barbiturate method or at least discontinue the use of the paralytic agent pancuronium bromide. 553 U.S. at 56-57. That specific claim required the prisoner to show that the proposed alternative was feasible, available, and likely to reduce a significant risk of pain. *Id.* at 52, 61. The *Baze* opinion simply addressed the claim before the Court. It did not erect a new standard for pleading or proving every Eighth Amendment claim relating to manner of execution. In order to do so, it would have had to overrule *Jones* and *Hill*. It is exceedingly unlikely that this was not the Supreme Court's intention. *Shalala v. Illinois Council on Long Term Care*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.").

**D. The district court imposed an unprecedented, unsound, and sweeping "alternative method" requirement beyond that described in *Lombardi*.**

This Court clarified the *Lombardi I* holding in its published order denying rehearing in *Lombardi II*. *See In re Lombardi*, 741 F.3d 903 (8th Cir. 2014) (en banc). This Court rejected the prisoners' argument that its reading of *Baze* conflicted with *Jones v. Bock*, 549 U.S. 199, 213 (2007), and *Hill v. McDonough*, 547 U.S. 573, 582 (2006). Confronted with the facial conflict between the en banc opinion requiring that a viable

12

claim propose an alternative method, on the one hand, and the Supreme Court's ruling in *Hill*, on the other, this Court in *Lombardi II* attempted to harmonize the two rulings:

> In *Hill*, however, the plaintiff conceded that "other methods of lethal injection the Department could choose to use would be constitutional," [547 U.S.] at 580, and he alleged "that the challenged procedure presents a risk of pain the State can avoid while still being able to enforce the sentence ordering a lethal injection." *Id.* at 581. The plaintiffs in this case did not make such an allegation in the amended complaint. We therefore concluded that they failed to state a claim by failing to allege even the elements of an Eighth Amendment claim as defined in *Baze*.

*Lombardi II*, 741 F.3d at 905.

Without conceding the underlying premise of the two *Lombardi* opinions, the prisoner's second amended complaint supplied the asserted omission. It included the *Hill* language whose absence this Court held to be dispositive in *Lombardi II*. The prisoners alleged that "the challenged procedure presents a risk of pain the State can avoid while still being able to enforce the sentence ordering a lethal injection." (App. 117, 202). They also "concede[d] that other methods of lethal injection the Department could choose to use would be constitutional." (*Id.* at 202). The plaintiffs therefore brought their action within the fact-pattern of *Hill* in the respect that *Lombard II* modified its opinion to conform its ruling to *Hill*.

The district court's ruling to the contrary is erroneous. Pointing to the en banc order's citation of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the district court reasoned that *Iqbal* itself requires the prisoner to specify a reasonably available alternative that is less

13

likely to create a substantial risk of harm, and that *Hill* language is a mere "naked assertion" that does not create a "plausible" claim for relief. (Add. at 9-10). But this Court said no such thing when it tried to harmonize *Baze* and *Hill*, and indeed, the Court **could not** harmonize *Baze* and *Hill* by requiring a prisoner to allege anything more than Mr. Hill. If *Iqbal* required a prisoner to plead an alternative method, then this Court would have said so.

If the district court was correct, the Supreme Court in *Baze* would have stated that *Hill* and *Jones* were overruled by the *Iqbal* principle announced in *Bell v. Twombly*, 550 U.S. 544 (2007). The opinion in *Twombly* preceded *Baze* by eleven months. Like *Iqbal*, the ruling in *Twombly* disapproved "formulaic recitations of the elements of a cause of action," and "naked assertions" devoid of further factual enhancement. 550 U.S. at 555, 557. These principles already governed pleading at the time of *Baze*. If indeed the *Twombly*/*Iqbal* principle overruled the unanimous opinions in *Hill* and *Jones* by requiring a prisoner's complaint to specify an alternative method of execution, then the Court in *Baze* would have said so.

### E. The district court's pleading requirement is unworkable because the prisoners lack the discovery needed to propose a "feasible" and "readily implemented" alternative.

Even if the district court's ruling were consistent with *Baze* and *Lombardi II*, the prisoners could not satisfy it without full and fair discovery into the Department's efforts to identify, select, procure, and test execution drugs. Mr. Worthington cannot show that

14

an alternative method is "feasible" and "readily implemented," *see Baze*, 553 U.S. at 52, without knowing what efforts the defendants have attempted, even as the defendants themselves insist that suppliers are hesitant to furnish them with lethal injection drugs. As noted earlier, the state resisted any and all discovery of their present or previous suppliers, and they refused to comply with any such discovery after the *Lombardi* rulings. The Court's dismissal order stayed all discovery. (Add. 24). This order, therefore, prevents compliance with its own directive, because the prisoners cannot discover specific information that is uniquely and peculiarly available to the defendants. The practical effect is to disable any and every Eighth Amendment claim targeting a method of execution, unless the prisoner somehow knows how and where his executioner may readily obtain the instruments of his death—and in a regime where that very information is kept secret by the executioners, their supervisors, and their attorneys.

### F. The district court's pleading requirement creates an impossible conflict of interest between lawyer and client.

The pleading standard imposed by the district court would require counsel and other death row attorneys to violate the rules of professional ethics. Mr. Worthington's attorneys cannot suggest any means for the state of Missouri to kill him because he has neither selected a means of death nor directed his attorneys to seek such means. In every lawyer-client relationship, "the client, not the lawyer, determines the goals to be pursued." Restatement (Third) of the Law Governing Lawyers, § 16A cmt. c (2000). Rule

15

1.2 of the Missouri Rules of Professional Conduct requires a lawyer to "abide by a client's decisions concerning the objectives of the representation." Mo. Sup. Ct. R. 4-1.2(a).

By determining that *Baze* closes the courthouse door to Mr. Worthington's Eighth Amendment pleading if counsel fails to recommend another method for killing him, the district court's rule violates counsel's obligation under Rule 1.2(a). A court would instruct counsel to abandon the client's objective and instead to concede the constitutionality of an untested method of execution. If counsel meets the district court's understanding of the pleading standard by conceding an alternative means for the state to execute Mr. Worthington, counsel would violate Rule 1.2 by contradicting Mr. Worthington's decision-making authority as client. But if counsel wants to avoid violating Rule 1.2 by not providing an alternative means of execution in the pleading, counsel has arguably violated Rule 1.3's requirement of diligence by refusing to comply with the alleged pleading requirement. See Mo. Sup. Ct. R. 4-1.3.

Refusal to engage in the macabre task of actively supporting an alternative method of execution protects an important right for Mr. Worthington. As the Supreme Court has held, "[b]y declaring his method of execution, picking lethal gas over the State's default form of execution—lethal injection—[a death row inmate] has **waived any objection** he might have to it." *Stewart v. LaGrand*, 526 U.S. 115, 119 (1999) (emphasis added). Mr. Worthington—and his counsel—therefore are forced to abandon an important Eighth

16

Amendment argument if they are required to affirmatively choose a method of execution.

An alternative-method requirement would create a concurrent conflict of interest and would perversely require removal of Mr. Worthington's counsel. The concurrent conflict rule prohibits representation if "there is a significant risk that the representation … will be materially limited … by the lawyer's responsibilities … to a third person …" Mo. Sup. Ct. R. 4-1.7(a)(2). The conflict that arises from the alternative-method requirement is intrinsic to the representation. The district court would require counsel to make an argument that cuts against the very goal of the client's representation: preventing his execution. The court's application of *Baze* not only ignores that client-defined objective, but it describes advocacy on "behalf" of the death row inmate as a concession to the state's desired result: that an alternative method of execution is constitutional. This is a cognizable, even palpable, conflict that poses all the dangers of the more traditional, extrinsic conflicts of interests.

By embracing the conflict of interest inherent in the district court's directive, and helping the state select a method to kill Mr. Worthington, his attorneys would become ineffective. The Supreme Court has repeatedly recognized that the Sixth Amendment right to effective assistance of counsel includes the right to a representation free from conflicts of interest. *See Glasser v. United States*, 315 U.S. 60, 70 (1942). "[T]he rule against representing adverse interests [of present clients] was designed to prevent a …

17

practitioner from having to choose between conflicting duties, or attempting to reconcile conflicting interests rather than enforcing a client's rights to the fullest extent." *Smiley v. Dir. Office of Workers Comp. Programs*, 984 F.2d 278, 282 (9th Cir. 1993). Requiring counsel to argue in favor of a method for killing Mr. Worthington is decidedly unjust; it prohibits counsel from "enforcing [the] client's rights"—or pursuing Mr. Worthington's wishes—"to the fullest extent." *Smiley*, 984 F.2d at 282.

Generally, the Rules address conflicts of interest by requiring the lawyer to remove herself from the representation. See Mo. Sup. Ct. R. 4-1.7, cmts. [2]-[4]. Under the circumstances of this case, however, such a remedy is both impractical and illogical. Removal would bring heavy burdens by replacing counsel who are familiar with the case's complex facts and procedural history with new counsel. Replacement counsel, in turn, would fail as a remedy because the new counsel would labor under the same conflict. A death row inmate's lawyer would breach his duty of diligence should he fail to pursue a claim that might secure his client's desired outcome. *See* Mo. Sup. Ct. R. 4-1.3. The district court's pleading requirement is as unworkable and inequitable in practice as it is unjustified by precedent.

### G. Mr. Worthington shows a sufficient risk of severe pain to justify further proceedings—as recognized by the district court—and he is entitled to a stay in order to complete those proceedings.

The district court agreed with Mr. Worthington and his fellow plaintiffs in a critical respect. It rejected the defendants' argument that an Eighth Amendment claim

18

requires that a prisoner allege and literally prove that the state's method of execution is "**sure or very likely** to cause serious illness or needless suffering," as opposed to the *Baze* court's definition of that term: "[T]o prevail on such a claim there must be **a substantial risk of serious harm**, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment." *Baze v. Rees*, 553 U.S. 35, 50 (2008) (opinion of Roberts, C.J.). That question was fiercely litigated in the *Bucklew* litigation, and the Supreme Court granted a stay.

The natural starting point is, of course, *Baze* itself. The relevant portion of the Chief Justice's plurality opinion quotes *Helling v. McKinney*, 509 U.S. 25 (1993); *see Baze*, 553 U.S. at 50. At the place the Chief Justice quotes it, this noncapital opinion sets out a general principle to govern prospective relief concerning prison conditions that ambiently affect prisoners' health:

> We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year.

*Helling*, 509 U.S. at 34-35, cited in *Baze*, 553 U.S. at 50.

*Helling* concerned a prisoner's exposure to second-hand cigarette smoke from his cellmate, and the Court held that the prisoner stated a viable Eighth Amendment claim. 509 U.S. at 35. Needless to say, no single individual can possibly prove that second-hand

Appellate Case: 14-2220    Page: 19    Date Filed: 07/30/2014 Entry ID: 4180985

smoke is "sure or very likely" to cause lung cancer or similarly serious harms. But that was not the actual test: "McKinney states a cause of action under the Eighth Amendment by alleging that petitioners have, with deliberate indifference, exposed him to levels of ETS [environmental tobacco smoke] that pose **an unreasonable risk of serious damage** to his future health." *Id.* (emphasis added).

The Chief Justice in *Baze* explained what the "sure or very likely" language from *Helling* actually means:

> We have explained that to prevail on such a claim there must be a "**substantial risk of serious harm**," an "objectively intolerable risk of harm" that prevents prison officials from pleading that they were "subjectively blameless for purposes of the Eighth Amendment."

*Baze*, 553 U.S. at 50, emphasis added, citing *Helling*, and quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 846 & n. 9 (1994). This is the language that appears throughout the Chief Justice's opinion as the legal standard on the merits in *Baze*. *Id.* at 50, 52 & n.3; see also *id.* at 116 (Ginsberg, J., dissenting) (reflecting three votes for similar standard, and not disputed by the Chief Justice as to his phrasing of the test); *id.* at 36-37 (syllabus).

Defendants also cited the one-paragraph summary ruling in *Brewer v. Landrigan*, 131 S. Ct. 445 (2010), but nothing in *Landrigan* altered *Baze*. It is true that the Court recited the "sure or very likely" language in vacating a stay. But it never altered the **definition** of that language from *Baze*, and it noted that the language came from the Court's earlier opinion in *Helling*, which, again, was a case about the risks caused by

20

second-hand cigarette smoke in which the prisoner stated a viable Eighth Amendment claim. *See Landrigan*, 131 S. Ct. at 445. It is unlikely that the Court intended for *Landrigan* to modify *Baze*. *See Edelman v. Jordan*, 415 U.S. 651, 671 (1974) (lesser precedential value of summary rulings). And in any event, the district court in *Landrigan* expressly stated that it was issuing a TRO because it could only "speculate" that a non-FDA-approved drug "will cause pain and suffering." 131 S. Ct. at 445. The Court's summary ruling means only that speculation does not satisfy *Baze*. And the Court's later grant of a stay to Mr. Bucklew reflects its agreement with Mr. Bucklew's view of the relevant Eighth Amendment test.

The district court agreed with the prisoners in a second critical respect: they bring an Eighth Amendment claim involving a sufficient "risk and level of pain that the current execution protocol carries." (Add. 8). Plaintiffs plead that the defendants' use in lethal injections of what they represent to be pentobarbital from an undisclosed compounding pharmacy creates a substantial risk of severe pain or an objectively intolerable risk of severe pain. (App. 91-111). Compounding pharmacies are not subject to the government regulation on which Americans rely for the identity, purity, potency, and efficacy of the medications they take—and on which experts and courts have relied in rendering opinions and making judgments about the substances which the defendants have used in past lethal injection litigation. (*Id.*). Among other problems, reputable vendors of pentobarbital will not sell the drug to the Department of Corrections,

Appellate Case: 14-2220    Page: 21    Date Filed: 07/30/2014 Entry ID: 4180985

unregulated compounded drugs involve precursor chemicals from unknown and unregulated suppliers, and compounding pharmacies lack the institutional competence to test either the precursor chemicals or the product they tender to their customers. (*Id.* 97-100).

Attached to and included within the complaint are analyses from pharmacology expert Larry D. Sasich and anesthesiologist Mark J.S. Heath. Dr. Sasich explains that compounded drugs are unreliable because they are largely unregulated. (*Id.* 251-254). Compounding pharmacies represent "an emerging, substandard drug industry responsible for making large quantities of unregulated, unpredictable and potentially unsafe drugs." (*Id.* 253). The drugs they make often contain counterfeit or substandard ingredients, and drug compounders often use poor practices; as a result, the process of compounding "often results in drugs which are contaminated, sub-potent or super-potent, or which do not have the strength, quality or purity ... required for the safe and effective treatment of patients." (*Id.* 254).

Reputable suppliers of pharmaceutical ingredients generally sell directly only to FDA-approved manufacturers of finished products. (*Id.* 258). That leaves compounding pharmacies to depend on the unregulated "grey market" in which ingredients may come from China, India, or other countries that do not reliably inspect pharmaceutical ingredients; the drugs may not even be what they purport to be, and it is all but impossible to trace the active ingredient to its original manufacturer in order to verify its

Appellate Case: 14-2220     Page: 22     Date Filed: 07/30/2014 Entry ID: 4180985

quality. (*Id.* 257-259). In light of these hazards, "The potential harm associated with the use of such contaminated or sub-potent drugs is extremely high." (*Id.* 254). That harm is enhanced by the secrecy concerning the Department of Corrections' supplier, which creates even greater uncertainty as to the origins and quality of the drug's ingredients. (*Id.* 256).

Dr. Sasich outlines four specific hazards from the use of compounded pentobarbital in executions. First, there is a "substantial risk" that the drug may be sub-potent or super-potent, either from (a) the fact that Missouri's protocol specifies no means of adjusting the measurements of the chemical to account for the drug's hygroscopic (water-absorbing) nature, (b) chemical degradation caused by impurities or contamination, (c) a compounding error, or (d) the possibility that Defendants' drug is not actually pentobarbital. (*Id.* 259, 263-266). Sub-potent pentobarbital risks "acute intoxication, life-threatening but not fatal respiratory depression, and/or paradoxical stimulation." (*Id.* 265). Super-potent pentobarbital, meanwhile, may result in "suffocation and gasping for breath, before the loss of consciousness." (*Id.* 266).

A second problem Dr. Sasich identifies is the danger that compounded pentobarbital will be contaminated with dangerous allergens, toxins, bacteria, or fungus—any of which could induce severe allergic or blood reactions that are "highly unpredictable, rapidly evolving and potentially painful and agonizing." (*Id.* 261-263). A third danger arises from particle contamination. The compounded pentobarbital may

23

contain foreign particles that will either contaminate the solution or precipitate out of it, creating a "substantial risk of pain and suffering" on injection, as well as a risk of pulmonary embolism. (*Id.* 262-264). Fourth and finally, Dr. Sasich states that the dosage form of the drug may fail to reach or maintain the proper pH, which risks burning on injection, the precipitation of solid particles that could cause a pulmonary embolism, or the multiplication of bacteria and fungus that may "create instability and/or incompatibility with human blood." (*Id.* 264). Dr. Sasich concludes that compounded pentobarbital creates a "**substantial risk of serious, unnecessary and substantial harm and mental anguish**." (Id.)(emphasis added). Dr. Heath states that sub-potent pentobarbital may severely disable the prisoner without actually killing him. It carries a risk that the prisoner "will be unconscious for an extended period of time while breathing inadequately, before waking up in a permanently brain-damaged state." (*Id.* 234). Dr. Heath concludes that Missouri's protocol is "replete with flaws that present a **substantial risk of causing severe and unacceptable levels of pain and suffering** during the execution." (*Id.* 236)(emphasis added).

To make matters worse, the defendants are administering expired drugs. Dr. Sasich explains that United States Pharmacopeia Chapter (USP) <797> defines the "Beyond Use Date" (BUD) as the date or time after which a compounded sterile preparation should not be administered, stored, or transported. Chapter <797> of the USP assigns BUDs for drugs compounded from non-sterile Active Pharmaceutical

24

Ingredients (High Risk Compounding). If the drug is stored at room temperature, the BUD is 24 hours; if refrigerated, 3 days, and if frozen, 45 days. (App. 519-520). Based on laboratory reports disclosed by the defendants—which they ceased disclosing after their first three pentobarbital executions—the drugs used in Joseph Franklin's execution were stored at room temperature and were compounded sixteen days before the execution, and the defendants administered an expired drug. (*Id.* 521). A similar analysis governs the drug with which Allen Nicklasson was executed. (*Id.* 521-522). Dr. Sasich described the state's practices as a "very troubling deviation from USP standards," which carries a "very high risk that the compounded drug will degrade or allow for more rapid growth of bacteria." (*Id.* 104). Improper storage creates "a very substantial, even grave, risk that the prisoner will suffer severe pain and/or an immediate severe allergic reaction." (*Id.* at 105).

The state may argue, as it did below, that its eight pentobarbital executions have been relatively uneventful. (*Id.* 542, 685-686). This contention, however, does not defeat the prisoners' claims. For one thing, the defendants switched suppliers after their third execution. (E.C.F. Doc. 360 at 2). For another, the drug cocktail used for each execution is separately compounded, and the evidence of record states that there is no way to ensure the reliability and safety of the state's pentobarbital from batch to batch or execution to execution. (App. 519). Finally, the state now refuses to disclose whether it even tests its drugs at all, never mind the identity, credentials, or complaint-history of

25

its current pharmacy. (*See* Depo of Matthew Briesacher (Mar. 21, 2014), at 43-44, 72-73; App. 560-561; 642-643, 651). Dr. Sasich's words ring even truer with the state's about-face on testing: "The additional documents that I have reviewed provide no evidence that Missouri actually knows what will be injected into a condemned prisoner." (*Id.* 522).

### H.   Intervening developments support a stay of execution.

In *Baze*, the court stated that Kentucky's former execution method was not likely to be "objectively intolerable" under the Eighth Amendment because it was "widely tolerated" by the thirty states that used the same method. *Baze v. Rees*, 553 U.S. 35, 53 (2008). But Missouri's method and the secrecy attending it are not "widely tolerated" today. To the contrary, recent developments disfavor the State of Missouri's new policy of monthly executions.

Four recent executions shed light on the substantial risk of serious harm that execution drug failure can cause. Twelve seconds into his execution in Oklahoma, which utilized a three-drug cocktail that included pentobarbital obtained from an unnamed compounding pharmacy within the state, Michael Lee Wilson uttered his chilling final words: "I feel my whole body burning."[3] A week later, Ohio executed Dennis McGuire with a combination of drugs never before used in lethal injection in the United States, and he "struggled, made guttural noises, gasped for air and choked for about 10

---

[3] Rick Lyman, *Ohio Execution Using Untested Drug Cocktail Renews the Debate over Lethal Injections*, New York Times, Jan. 17, 2014, at A15.

26

minutes."[4]   A few months ago, Clayton Lockett's execution in Oklahoma ago was horribly botched: he regained consciousness, writhed, groaned and took 43 minutes to die, reportedly from a heart attack—only after the blinds were drawn on the execution chamber to obscure what really happened from public scrutiny.[5]   Last week, it took Arizona death row inmate Joseph Wood nearly two hours to die after he was injected with drugs obtained in secrecy from a compounding pharmacy.[6]

Oklahoma and Ohio have temporarily stayed executions.[7]   The Supreme Court halted Russell Bucklew's execution two months ago. The State of Louisiana is under orders to disclose the "identity of the [execution] drugs' manufacturers and sources" and the "entities involved in supplying and testing those lethal chemicals." *In re LeBlanc*, No. 14-30198, 2014 WL 1245251 (5th Cir. Mar. 27, 2014) (denying state's mandamus

---

[4]Alan Johnson, *Inmate's Death Called 'Horrific' Under New, 2-Drug Execution,* The Columbus Dispatch, Jan. 17, 2014.

[5]Katie Freckland, *Clayton Lockett writhed and groaned. After 43 minutes, he was declared dead*, The Guardian, April 30, 2014, available at http://www.theguardian.com/world/2014/apr/30/clayton-lockett-oklahoma-execution-witness.

[6]Michael Muskal, HOW DID ARIZONA EXECUTION GO WRONG, Los Angeles Times, July 24, 2014.

[7]Mark Berman, *Oklahoma attorney general agrees to delay execution for six months*, Washington Post, May 8, 2014; Elizabeth Barber, *Federal judge orders halt to executions in Ohio until mid-August*, Christian Science Monitor, May 28, 2014.

27

petition). Even Missouri's attorney general believes that the state's "creeping" secrecy "may not be prudent."[8]

Michael Worthington seeks a stay so that the courts may carefully and soundly determine whether Missouri's execution method is constitutional. His premature execution would violate a growing consensus of caution with respect to novel methods of execution that are shrouded in secrecy.[9] "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man." *Atkins v. Virginia*, 536 U.S. 304, 311 (2002), quoting *Trop v. Dulles*, 356 U.S. 86, 100-101 (1958). "The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Id.* at 311-12.

## IV.

## THE REMAINING CONSIDERATIONS JUSTIFY A STAY.

In addition to the merits of Mr. Worthington's claim, the Court must also consider the balance of harms and whether Mr. Worthington has unduly delayed his claim. *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004); *Nooner v. Norris*, 491 F.3d 804, 808 (8th Cir. 2007). These factors also weigh in favor of a stay.

---

[8]Jeremy Kohler, *Missouri attorney general: State needs its own execution pharmacy*, St. Louis Post-Dispatch, May 29, 2014.

[9]*E.g.*, Jason Riley, *Flawed executions in other states cause more death penalty scrutiny in Kentucky* (June 1, 2014), available at <<http://www.wdrb.com/story/25653974/sunday-edition-flawed-executions-in-other-states-cause-more-death-penalty-scrutiny-in-kentucky>>

Appellate Case: 14-2220    Page: 28    Date Filed: 07/30/2014 Entry ID: 4180985

Bearing in mind that the death penalty is "obviously irreversible," *Evans v. Bennett*, 440 U.S. 1301, 1306 (1979) (Rehnquist, J., granting stay as circuit justice), the protocol at issue here carries a "substantial risk" that Mr. Worthington's last conscious memory will be the experience of severe pain. And although the state has an interest in enforcing criminal judgments without unnecessary delay, it does not have a legitimate interest in executing prisoners illegally or unconstitutionally. "[T]he public interest has never been and could never be served by rushing to judgment at the expense of a condemned inmate's constitutional right." *In re Ohio Execution Protocol Litigation*, 840 F. Supp. 2d 1044, 1059 (S.D. Ohio 2012).

Neither has Mr. Worthington delayed his constitutional claims in the slightest. He brought suit on June 26, 2012, or only six weeks after the Department announced an execution method featuring the use of the anesthetic propofol. The Department changed its protocol several times before announcing the compounded-pentobarbital method on October 22, 2013. Mr. Worthington and the other prisoners proffered an amended complaint as promptly as possible, on November 8, 2013, marshaling expert evidence in support of their claim that the protocol violates the Eighth Amendment. ECF Doc. 147. The prisoners proffered a second amended complaint on January 27, 2014, which they filed with the district court's leave one week later. Exhibit 8.

Mr. Worthington, then, has been asserting an Eighth Amendment claim against the current protocol since November 8, 2013, or some two weeks after the protocol was

29

announced. Mr. Worthington's execution was not scheduled until June 30, 2014. The district court dismissed the *Zink* case on May 16, and the prisoners' appeal will not be resolved before the scheduled execution date of August 6. This is certainly not a case, then, in which "a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Hill*, 547 U.S. at 584. On July 3, this Court ordered that this appeal be heard *en banc* and expedited this appeal. The case will be argued on September 9, 2014 and a decision will likely issue before the end of the year. Therefore, a stay of execution here will not be indefinite like the prior stay requests that were previously denied in this appeal. Under this accelerated schedule, this litigation will likely be completed in a matter of months, not years. The Court should stay Mr. Worthington's execution to allow him to survive until this Court resolves this appeal.

Appellate Case: 14-2220    Page: 30    Date Filed: 07/30/2014 Entry ID: 4180985

Respectfully submitted,

/s/  *Kent E. Gipson*
KENT E. GIPSON, #34524
Law Office of Kent Gipson, LLC
121 East Gregory Boulevard
Kansas City, Missouri 64114
816-363-4400 • Fax: 816-363-4300
kent.gipson@kentgipsonlaw.com


/s/  *Gino F. Battisti*
GINO F. BATTISTI, #2586
Foley & Mansfield, P.L.L.P.
1001 Highlands Plaza Dr. West, Ste. 400
St. Louis, Missouri 63110
314-925-5700
gbattisti@foleymansfield.com


*Counsel for Petitioner*


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was forwarded for transmission via Electronic Case Filing (ECF) this 30th day of July, 2014, to:

Counsel for Defendants-Appellees

This Court's electronic filing system should serve counsel for the appellees, as all are electronic filers.

/s/ *Kent E. Gipson*
KENT E. GIPSON

*Attorney for Appellant Michael Worthington*